**Gabriel G. ATAMIAN, MD, Msee, JD, Plaintiff,**

v.

**Trp. HAWK, Delaware State Police; Officer 'John Doe', Security Guard of Christiana Hospital; and Christiana Hospital, Defendants.**

No. Civ.A. 02C–02–001HDR.

Superior Court of Delaware, Kent County.

Submitted Aug. 15, 2003.
Decided Sept. 30, 2003.

Gabriel G. Atamian, Dover, Delaware, pro se.

Rosemary K. Killian, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Trooper Mark Hawk.

James E. Drnec, Morris, James, Hitchens & Williams, Wilmington, Delaware for Christiana Hospital.

## BACKGROUND

RIDGELY, President Judge.

This case arises from an incident that occurred outside Christiana Hospital early on the morning of December 12, 2001. Plaintiff Atamian was waiting for a bus when he was approached and "patted down," by Defendant Hawk, a Delaware State Police officer. His bags were searched by Defendant DiOssi, a Christiana Hospital Security Guard. Plaintiff's original claims were: violation of 42 *U.S.C.* § 1983,[1] assault and battery, "warrantless

1. § 1983. Civil action for deprivation of rights Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Co-

arrest and illegal search," violation of Article I, § 6 Delaware State Constitution, and violation of 11 *Del. C.* § 2303 against Officer Hawk and Defendant DiOssi; violation of 42 *U.S.C.* § 1983 against the State of Delaware, and violation of Article I, § 6 Delaware State Constitution against Christiana Hospital. The State of Delaware's Motion to Dismiss was previously granted by this Court, because it is not a "person" for purposes of any § 1983 claim.[2] Defendant Hawk's Motion for Summary Judgment on the ground of qualified immunity was denied because facts were in dispute surrounding the search of Plaintiff's bags. However, this Court held that although the investigatory stop and frisk were appropriate. With additional discovery having been taken defendants Hawk, DiOssi, and Christiana Hospital now move for Summary Judgement. Although some facts remain in dispute, the undisputed material facts support Defendants motions. Accordingly, the motions are granted.

## FACTS

The search at issue was not governmental action but a private search. The pat down by Trooper Hawk was authorized by law and there was no touching of the Plaintiff by any other Defendant.

The search of Plaintiff was precipitated by events that occurred while Plaintiff was riding a DART bus from Rodney Square to Christiana Hospital in the early morning hours of December 12, 2001, just three months from the events of September 11, 2001. While on the DART bus, there was a confrontation between Plaintiff and bus passengers during which they asked his nationality and suggested he was an Afghan, Plaintiff responded that he was an American. He also made statements about "the machinery" of the government being against him.[3]

After Plaintiff Atamian got off the bus at Christiana, the bus driver called the 911 Emergency Operations Center ("RECOM") and reported Atamian as a suspicious person. RECOM dispatched Cpl. Hawk to investigate with a physical description of Plaintiff that included information that he was carrying two blue bags, he had just come from New York City, and that he had made statements that he hated the government; also that the bus passengers feared he might be a terrorist.[4] Cpl. Hawk also knew that Plaintiff had come to the hospital for no apparent purpose (he had not sought treatment or visited a patient.)[5] In addition to dispatching Cpl. Hawk, RECOM also notified Christiana Hospital of the suspicious person, and the report of the bus driver.[6]

Plaintiff asserts that Cpl. Hawk, followed by three or four security guards and

---

lumbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 *U.S.C.* § 1983 (pertinent part).

2. Docket No. 17.

3. Plaintiff has acknowledged telling the passengers that the machinery of Delaware Government was against him. He denies any such statements against the U.S. Government.

4. Affidavit of Terry M. Whitham, RECOM manager and attached Incident Report.

5. Affidavit of Cpl. Hawk at para. 5.

6. Affidavit of Terry M. Whitham, manager at para. 4 and pg. 2 of attached Incident Report.

three or four other hospital employees, approached him while he stood outside the bus shelter near the Women's Pavilion.[7] Defendants assert that prior to Cpl. Hawk's arrival, three hospital security guards made contact with Plaintiff, at least one arriving prior to Defendant DiOssi.[8] DiOssi introduced himself as a Christiana Hospital employee upon contact.[9] The facts surrounding the frisk are undisputed. Plaintiff's blue bags were in the bus shelter while Plaintiff was "a little bit outside" the shelter.[10] Shortly after Atamian reached the shelter, Cpl. Hawk approached Plaintiff with caution, asked him to put his hands on his head, and "patted down" his outer clothes to see if he had a weapon.[11] Hawk felt Plaintiff's wallet, which Plaintiff removed from his pocket and handed to Cpl. Hawk; Hawk looked inside for a razor blade and handed it back to Plaintiff.[12] Plaintiff produced his driver's license and handed it to Cpl. Hawk.[13]

Plaintiff admits that Defendant DiOssi told Trooper Hawk that Plaintiff had two bags and that he (DiOssi) was going to search the bags.[14] Plaintiff testified that Cpl. Hawk made a gesture with his right hand in a forward motion past the right side of his head in response to DiOssi's statement.[15] Plaintiff concedes in his de-

position that Hawk did not verbally give permission to DiOssi or even speak in response to DiOssi's statement that he intended to search the bag; he alleges only that Hawk made the hand gesture, which Atamian interprets as the giving of permission.[16]

Both defendants, assert that DiOssi proceeded with his search of Plaintiff's bags prior to Cpl. Hawk's frisk of Plaintiff. Regardless of the exact sequence, it is undisputed that Christiana Hospital security received notification from RECOM that the police had been notified of a suspicious person on hospital grounds and that it had dispatched a State Trooper. It is also undisputed that Christiana security then radioed Defendant DiOssi to alert him to investigate, and DiOssi contacted Plaintiff near the bus kiosk outside the Women's Health Building.[17] DiOssi states that he asked Plaintiff's permission to search his bags and Plaintiff consented. Plaintiff denies giving consent and for purposes of the present motions that version controls. DiOssi searched the bags and further maintains that he would have searched the bags regardless of Plaintiff's consent, because of his concern for the safety of the hospital and those in the immediate vicini-

---

7. Atamian Dep. at p. 43.

8. DiOssi's Answers to Plaintiff's Interrogatories at p. 7.

9. Atamian Affidavit at para. 19, Hawk Affidavit at para. 5.

10. Atamian Dep. at p. 71.

11. Atamian Affidavit at para. 24; Hawk Affidavit at para. 6.

12. *Id.* (Hawk at para. 7; Atamian at para. 25–27.)

13. Atamian Depo. at p. 51.

14. Atamian Depo. at p. 52.

15. Atamian Depo. at p. 51–2.
 Q. At some point, Officer DiOssi searched your-
 A. One minute. That was, at that time, John Doe. John Doe asked Officer Hawk the permission to search my two bags. And Officer Hawk did like this.
 Q. Okay. For the record, Dr. Atamian is gesturing with his right hand in a forward motion past the right side of his head.
 A. That means yes.

16. *Id.* at p. 52.

17. DiOssi Affidavit at para. 2–4.

ty of the plaintiff.[18]

It is undisputed that after Plaintiff produced his license, Cpl. Hawk stepped away from Plaintiff and took the identification to his car to verify it.[19] Cpl. Hawk was not present as DiOssi continued his search of the bags. Hawk returned shortly from verifying Plaintiff's identification, handed the license to Plaintiff, and asked DiOssi if Plaintiff could continue to wait for the bus in the shelter. DiOssi agreed. Hawk told Plaintiff he was free to go.[20]

## DISCUSSION

*1. The Legal Standard for Summary Judgment*

Pursuant to Superior Court Civil Rule 56(c), the movant on summary judgment bears the burden of demonstrating that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [21] A motion for summary judgment requires the Court to examine the record to determine whether the evidence is so one-sided that one party should prevail as a matter of law.[22] The Court will consider the pleadings, depositions, answers to inter-

rogatories, admissions on file, and affidavits in making its determination.[23] If, after viewing the record in the light most favorable to the nonmoving party, the Court finds no genuine issues of material fact, summary judgment is appropriate.[24] However, summary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.[25]

The moving party initially bears the burden of showing a genuine material issue of fact does not exist.[26] If a properly supported motion for summary judgment shows no genuine issue of material fact, the burden shifts to the nonmoving party to prove material issues of fact exist.[27] To carry its burden, the nonmovant must produce specific facts which would sustain a verdict in his favor.[28] The nonmovant cannot create a genuine issue for trial through bare assertions or conclusory allegations.[29]

*2. Governmental vs. Private Search*

 Private searches are generally immune from the Fourth Amendment re-

18. DiOssi Affidavit at para. 6–8.

19. Atamian Depo. at p. 80.

20. Atamian Affidavit at para. 29; Hawk Affidavit at para. 8.

21. Del.Super. Ct. Civ. R. 56(c).

22. *Burkhart v. Davies*, Del.Supr., 602 A.2d 56, 59 (1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

23. Del.Super. Ct. Civ. R. 56(c).

24. *Hammond v. Colt Ind. Operating Corp.*, Del.Super., 565 A.2d 558, 560 (1989).

25. *Wilson v. Triangle Oil Co.*, Del.Super., 566 A.2d 1016, 1018 (1989).

26. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 680 (1979).

27. *Id.* at 681.

28. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (Because the Federal Rules of Civil Procedure and the Delaware Superior Court Civil Rules are similar, construction of the Federal Rules is persuasive concerning the construction of Superior Court Rules. *Hoffman v. Cohen*, Del.Supr., 538 A.2d 1096, 1097–98 (1988)).

29. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Martin v. Nealis Motors, Inc.*, Del.Supr., 247 A.2d 831, 833 (1968).

strictions.[30] A search conducted by a private person may be regarded as government action and implicate Fourth Amendment protections if the individual was acting as an "instrument or agent" of the government.[31] The two critical factors for determining whether a private individual or company acts as an "instrument or agent" of the government are: (a) whether the government knew of and acquiesced in the intrusive conduct, and (b) whether the party performing the search intended to assist law enforcement efforts or to further its own ends.[32] I will apply these same factors to an alleged violation of the Delaware constitution.

█ The first factor is knowledge of or acquiescence in the intrusive conduct by the state. Mere presence of a police officer, without more, is insufficient to implicate Fourth Amendment concerns.[33] If a government agent "is involved 'merely as a witness,' the requisite government action implicating Fourth Amendment concerns is absent."[34] The police must instigate, orchestrate, encourage or exceed the scope of the private search in some affirmative way to trigger application of the Fourth Amendment.[35] De minimis or incidental contacts between the citizen and law enforcement agents prior to or during the course of a search will not subject the search to Fourth Amendment scrutiny.[36]

█ The second consideration is the motive of the private party conducting the search. A private individual who has a "legitimate, independent motivation" to conduct a search despite police involvement is not acting as an instrument or agent of the government.[37] Certain private entities, such as common carriers, have a valid interest in conducting searches independent of any government or law enforcement activity.[38] For example, in United States v. Smythe, the court held that where a bus agent was suspicious of the contents of a package that was to be sent aboard the bus and would have opened it anyway for the safety of the bus passengers, the agent had a legitimate independent interest in searching the package and the Fourth Amendment was not implicated.[39] This was despite some minimal involvement by a police officer who had been consulted. In another suspicious package case, government agents actively encouraged a UPS employee to open a suspicious package twice within five minutes; the Tenth Circuit held that the UPS employee was acting as an agent of the

---

**30.** State v. Benge, 2003 WL 21526885, 2003 Del.Super. LEXIS 245 (Del.Super.Ct.2003), citing United States v. Jacobsen, 466 U.S. 109, 115, 104 S.Ct. 1652, 80 L.Ed.2d 85, (1984); Virdin v. State, 780 A.2d 1024, 1030 (Del. 2001).

**31.** Id., citing United States v. Attson, 900 F.2d 1427, 1431 (9th Cir.1990).

**32.** State v. Hammond, 1993 WL 189563, 1993 Del.Super. LEXIS 156 (Del.Super.LEXIS 1993), citing U.S. v. Walther, 652 F.2d 788, 792 (9th Cir.1981).

**33.** United States v. Coleman, 628 F.2d 961, 965 (6th Cir.1980).

**34.** United States v. Smythe, 84 F.3d 1240 (10th Cir.1996) (citation omitted).

**35.** United States v. Lambert, 771 F.2d 83, 89 (6th Cir.1985), cert. denied, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985).

**36.** Smythe, supra, citing United States v. Walther, 652 F.2d 788, 791 (9th Cir.1981).

**37.** Smythe at 1243.

**38.** State v. Hammond, 1993 WL 189563, 1993 Del.Super. LEXIS 156 (Del.Super.LEXIS 1993), citing U.S. v. Pierce, 893 F.2d 669 (5th Cir.1990).

**39.** 84 F.3d 1240 (10th Cir.1996).

government.[40] In the Fifth Circuit, a search of an unclaimed bag by an airport employee was held to be a private search. The court noted that, despite the fact that a police officer was present and the employee knew of the officer's interest in the contents of the bag, the employee had not called the police to the scene and the officer had not requested or participated in the search.[41]

### 3. Analysis

The undisputed material facts viewed in the light most favorable to the Plaintiff indicate that DiOssi acted as an agent of the hospital in conducting the search, and not as an agent of the government. DiOssi announced to Plaintiff that he was going to search the bags. Cpl. Hawk gestured in response. Cpl. Hawk did not request or direct the search and was not actively involved in the search. In fact he was not present for parts of the search. Furthermore, DiOssi had an independent motivation as a Christiana security guard for searching the bags to ensure the safety of the hospital and staff in the vicinity. He has stated in his affidavit that he would have searched the bags for security purposes regardless of Plaintiff's consent.

From the undisputed facts, Cpl. Hawk's involvement in the search was *de minimis* at best. Mere presence of an officer is not sufficient to convert a private search into government action, and the gesture of waving as contended by Plaintiff cannot reasonably be interpreted as an action to make DiOssi an instrument of the government. The mere presence of Trooper Hawk in conjunction with DiOssi's independent motive for the search leads me to conclude that the search was private action as a matter of law. It is also well-settled that any section 1983 liability of a municipal or private corporation cannot be based on *respondeat superior* alone.[42] Plaintiff has not alleged any other basis for liability on the part of Christiana Hospital.

 The assault and battery claim against Cpl. Hawk also cannot survive because Hawk's contact with Plaintiff was privileged as a valid search pursuant to 11 *Del. C.* § 1903.

 To state a claim for assault and battery against Defendant DiOssi, Plaintiff must allege "an intentional, unpermitted contact upon the person of another which is harmful or offensive."[43] Plaintiff fails to allege any physical contact by Defendant DiOssi or any employee of the hospital for that matter. Thus, the assault and battery claim also fails.

### CONCLUSION

For the foregoing reasons and after careful consideration of the record in this case, I conclude that summary judgment must be **GRANTED** in favor of all Defendants.

**IT IS SO ORDERED.**

---

**40.** *United States v. Souza*, 223 F.3d 1197 (10th Cir.2000).

**41.** *United States v. Lamar*, 545 F.2d 488 (5th Cir.1977).

**42.** *Powell v. Shopco Laurel Co.*, 678 F.2d 504 (4th Cir.1982) *citing Monell v. New York City* *Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**43.** *Browne v. Saunders*, 768 A.2d 467 (Del. 2001).